UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
PHILIPPOS PHILIPPOU,

                        Plaintiff,                  **MEMORANDUM & ORDER**

            - against -                          06-6080 (MLO)

PHOTIOS COUGENTAKIS, DIMITRIOS LELLOS,
and GRANITE ASSOCIATES, INC.

                     Defendants.
------------------------------------------------------------X

**APPEARANCES:**

VON SIMSON & CHIN LLP
Attorneys for the Plaintiff
62 William Street, 6th Floor
New York, NY 10005-1543
By: Charles B. Von Simson, Esq.

WILLIAM J. TURKISH, ESQ.
Attorney for the Defendants
33 South Service Road
Jericho, NY 11753
By: William J. Turkish, Esq.

**ORENSTEIN, Magistrate Judge:**

## INTRODUCTION

Plaintiff Philippos Philippou ("plaintiff" or "Philippou") commenced this action against defendants Photios Cougentakis ("Cougentakis"), Dimitrios Lellos ("Lellos") and Granite Associates, Inc. ("Granite Associates") claiming damages resulting from the alleged breach of an oral employment contract. This case was tried non-jury before the undersigned upon consent of the parties on October 27 and 28, 2008. See 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73(a). Upon the conclusion of testimony, the plaintiff discontinued his claims against defendants Lellos and Granite Associates with prejudice leaving claims against Cougentakis for breach of contract, breach of implied in fact contract, promissory estoppel, account stated, unjust enrichment, imposition of a

constructive trust and an accounting. The undersigned directed that the parties submit post-trial briefs limited to the issue of personal liability of Cougentakis for the damages claimed by plaintiff. Upon review of all of the evidence and the parties' post-trial submissions, the undersigned finds that the plaintiff has proven his breach of contract claim and that Cougentakis is personally liable for the damages sustained by the plaintiff in the amount of $34,000. The following constitutes the Court's findings of fact and conclusions of law. See Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

After examining the evidence, observing the witnesses who testified in the courtroom, and considering the credibility and plausibility of their testimony, I make the following findings of fact.

In late 2004, Philippou was called by an acquaintance, Theodore Ermogenous, who has a business relationship with Cougentakis, and inquired whether Philippou would be interested in working with him and some other individuals including defendants Lellos and Cougentakis setting up a financial services business in London. (Tr. at 87).[1] Philippou expressed interest in that venture and, accordingly, Ermogenous forwarded his credentials to Cougentakis and Lellos. (Tr. at 34). Shortly thereafter, Philippou received a telephone call from Lellos to discuss this business opportunity and they agreed to meet in London to further discuss their potential business relationship. (Tr. at 34, 87). In January 2005, Philippou traveled from Cyprus, where he was living at the time, to London and met with Lellos and two associates, Ray Connors and Dino Apostolides, in London. (Tr. at 35-36, 88, 174). During the meeting, Lellos described that they were looking for someone to set up a company in London, get it registered with the financial services authority (FSA), and then to manage its operations in London. (Tr. at 37). Philippou discussed his

---

[1] "Tr." refers to the transcript of the bench trial held on October 27 and 28, 2008. The number following the abbreviation "Tr." refers to the page in the transcript wherein the specific reference can be found.

2

qualifications and Lellos expressed that he thought that Philippou's credentials fit the requirements of the position that they were looking to fill. (Tr. at 37). However, Lellos explained that he could not offer Philippou the position, but, rather, he had to consult with Cougentakis back in New York before any decision was made. (Tr. at 37).

During that meeting, the gentleman also discussed compensation. (Tr. at 88). Philippou requested $70,000 in salary and a 25% interest in the new company. (Tr. at 38). The meeting was then concluded, with the understanding that Lellos, Connors and Apostolides would speak with Cougentakis about Philippou and that Philippou would be advised shortly whether he got the job. (Tr. at 38). A few days later, Philippou received a telephone call from Lellos who said that he had conferred with Cougentakis and that Cougentakis would like to meet with Philippou to further explore their potential business relationship. (Tr. at 38). Philippou then traveled to New York to meet with Cougentakis. (Tr. at 39, 175). Philippou met with Cougentakis and Lellos in New York and Cougentakis advised that he was solely funding the whole venture and that the London company would have strong support from his business operations within the United States. (Tr. at 39, 167). While Philippou also toured the New York office, Granite Associates, and met with some of the New York brokers, he did not discuss compensation at all during this meeting. (Tr. at 39, 90). Shortly after Philippou returned to Cyprus, he received a telephone call from Lellos who offered him the job and stated that Philippou had to get started immediately. (Tr. at 39, 90). Although the parties had yet to agree on compensation, Philippou went to London and began work to set up the company in mid-February 2005. (Tr. at 39).

Philippou explained that the first thing he needed to do was register the new company, Granite Capital, so that they could proceed with FSA approval. (Tr. at 40). Accordingly, Philippou began the administrative work in that regard and engaged auditors and legal advisors. He also

located and secured office space and registered the company with the VAT authority, the tax authority in the UK. (Tr. at 40-41). During this time, Philippou testified that he communicated with Lellos who was in New York regarding the corporate structure. (Tr. at 41). Philippou described that they decided that the new entity was not going to be a subsidiary of Granite Associates. Rather, it would be a sister company owned by its partners, namely Cougentakis, Lellos, Apostolides and Philippou. (Tr. at 41). However, Philippou was the only person working on this project in London.

After the company was registered, Philippou described that, during the April/May 2005 period, his primary job responsibility was working on the FSA approval. (Tr. at 57, 59). Philippou testified that he, along with Lellos, Connors and Apostolides, were all involved in preparing the application and they all decided to hire a professional consultant who specialized in preparing this type of application. (Tr. at 59, 93). The application, which was filed in June 2005, was described by Philippou as "complicated" because "we had to authorize U.S. based employees, we had cross-border transactions; we had cross-border operations; we were understaffed; and we were underfunded." (Tr. at 60). Philippou held six roles in Granite Capital: CEO, CFO, compliance manager, money laundering and reporting officer, financial advisor, and director. (Tr. at 60). Philippou and the New York-based employees had to pass the UK exams in order for Granite Capital to be approved by the FSA. (Tr. at 62). Philippou passed the exam in August 2005 and a New York broker, Mr. Miglaccio, passed in October 2005. (Tr. at 61-62). As the only person in London working for Granite Capital, Philippou testified that he was in constant contact with the FSA, and that he responded to their questions and addressed their concerns. According to Philippou, the final obstacle to FSA authorization was funding, and Philippou advised his colleagues that there needed to be sufficient capital in the company. (Tr. at 65). In response,

$165,000 was sent from Granite Associates to Granite Capital and, shortly thereafter, Granite Capital was authorized by the FSA in January 2006. (Tr. at 65, 153). During this time, in addition to working on the FSA approval, Philippou testified that he worked on generating business and lining up potential clients, including a group of hotels from Cyprus who were looking to restructure their financing and a beverages company that was looking to raise capital. (Tr. at 63, 148). Philippou also looked for larger office space and performed administrative duties such as setting up the accounting system, filing quarterly reports with the VAT house, working on setting up payroll for the brokers who were to be hired, and engaged employment counsel. (Tr. at 70). In addition, he continued to work on trying to generate business. (Tr. at 70).

Philippou testified that from the time he began working in mid-February, he kept asking Lellos for a written agreement with regard to his compensation. In early April 2005, having worked without payment since mid-February and having personally incurred business expenses, Philippou started pressing Lellos for payment. (Tr. at 42). Philippou expressed to Lellos that his compensation should be comprised of salary and equity in the London company. In response, by e-mail dated April 11, 2005 to Philippou and copied to Cougentakis, Lellos proposed three options for compensation: (1) zero salary, but a 25% interest in the company; (2) $4,000/month in salary and a 15% interest in the company; or (3) $6,000/month in salary and a 10% interest in the company. (Ex. 1). Shortly following this e-mail, Philippou testified that he agreed to accept a consulting fee of $5,000/month and a 15% interest in the company. (Tr. at 45). According to Philippou, he insisted that the final terms of his compensation be reduced to writing and that he was assured that it would be done. (Tr. at 46). Philippou explained that he and Lellos spoke to one another in their native language, Greek, and that Lellos said things like "you are one of us", "don't worry, there is no problem, we are all Greeks." (Tr. at 46). Based on these assurances, Philippou

5

was convinced that there would be no problem. (Tr. at 46-48).

Philippou was instructed to send invoices for his salary to Granite Associates, which he did. (Tr. at 45, 48, Ex. 2). Philippou sent his first invoice in June 2005 to Granite Associates for the five-month period February to June 2005 for $25,000. (Tr. at 52, 54). After that first invoice, Philippou submitted monthly invoices for $5,000 per month to Lellos at Granite Associates. (Tr. at 54). The first payment that Philippou received was in November 2005 for $10,000, notwithstanding that he had submitted the invoice back in June 2005 for $25,000. (Tr. at 54). The next and final payment that Philippou received was in February 2006 for $20,000, although the invoices he had submitted totaled $55,000. (Tr. at 55). Cougentakis acknowledged that Philippou was not paid for several months that he worked, but claims that Philippou did not perform. (Tr. at 168). According to Cougentakis, Philippou was supposed to have Granite Capital up and running within six months, and since he did not do that, he was not paid beyond the first six months that he worked. (Tr. at 168-69). Cougentakis acknowledged that he never directly communicated that goal to Philippou. Rather, Cougentakis testified that he told Lellos to tell Philippou. (Tr. at 169). Lellos disputed that at trial, stating that his understanding was that as long as Philippou was working in London on behalf of Granite Capital, he would get paid $5,000/month. (Tr. at 184-85). Lellos acknowledged that he never told Philippou that his compensation was conditioned on meeting certain results and/or deadlines. (Tr. at 184). Lellos also testified that he never told Philippou that he would not get paid if he did not meet certain expectations. (Tr. at 185). It is undisputed that Philippou was never told that he was not due the salary reflected on the invoices. Rather, he was repeatedly told to be patient and that payment would come. (Tr. at 65).

Having incurred personal and business expenses, and having not been paid since February 2006, Philippou wrote a check to himself for $18,500 in May 2006 from the Granite Capital

account.[2] Philippou testified that he was "flat out broke" at the time that he wrote the check and applied it to his outstanding salary. (Tr. at 137).

Philippou first spoke directly with Cougentakis about his compensation in Spring 2006. (Tr. at 46). According to Philippou, Cougentakis never indicated that Philippou's salary was a corporate obligation, but rather represented that Cougentakis would be personally responsible for such payment. Philippou testified:

> Q. Were there ever any conversations between you and Mr. Cougentakis in which Mr. Cougentakis represented to you that he would individually be responsible for this salary agreement?
>
> A. Yes. I believe it was in March '06, I said that I - - we had a phone call in which he said to me that because of all the trouble that I went through with my financial situation by not getting paid on time, he said that . . . if I was not happy at the end, he would pay me, he would tip me for good work that I had done, and he would let me go.

(Tr. at 149). At trial, Cougentakis denied making that statement. (Tr. at 201). Even though Philippou had already worked without payment for several months, Cougentakis further reduced his compensation by reducing his percentage of equity in Granite Capital to 10%. Cougentakis explained that, at the time that he agreed to give Philippou a 15% interest in Granite Capital, he did not realize that Philippou would be sharing in the European business of Granite Associates, and therefore Philippou could have only a 10% share. Philippou conceded.[3]

Notwithstanding this agreement, and after Granite Capital had been approved by the FSA, Philippou was instructed to issue all of the shares of Granite Capital to Cougentakis personally. (Tr.

---

[2] The check was actually written for 10,000 British pounds. At trial, the parties agreed that the applicable conversion rate to U.S. dollars is $1.85 per pound, for a total of $18,500.

[3] As noted earlier, Philippou withdrew his claim for equity or profitsharing during trial. (Tr. at 194).

at 67, 102; see also Ex. 112 - Part of the FSA reflects that Cougentakis controls 99% of Granite Capital). According to Philippou, this was the first time he learned that he was not going to be a shareholder in Granite Capital. (Tr. at 67). Nevertheless, Philippou continued to perform his duties with the expectation that he would be compensated at the rate of $5,000/month.

In early June 2006, the funding for Granite Capital fell below the minimum capital required by the FSA. Philippou requested that funds be immediately transferred to Granite Capital so that he could prepare the quarterly report for the FSA. (Tr. at 77). Having not received the funds, on June 12, 2006, Philippou sent an e-mail to Cougentakis, Lellos, Apostolides and Connors advising that Granite Capital must file its FSA report for the second quarter at the end of the month and cannot do so given the current undercapitalization of the company. (Ex. 102). Given this circumstance, Philippou advised that they either needed to transfer the necessary funds or decide to cease the operation of Granite Capital. If they chose the latter, Philippou advised that he was owed $50,000 for services rendered. (Ex. 102) In response to that e-mail, Lellos advised Philippou that the funds were being transferred from New York to London that day, a Friday. (Tr. at 79). When the funds still had not arrived by the following Tuesday and Philippou's calls were not answered by Lellos or Cougentakis, Philippou testified that he called Lellos on a number that did not reveal his identity and Lellos answered the call. Lellos advised that the money had not been transferred and that he could not confirm if it was ever going to be transferred. (Tr. at 79-80). Following this conversation, Philippou decided to resign and sent a letter to Lellos and Cougentakis advising of his resignation. (Tr. at 81). Feeling that it was his duty to protect the assets and records of the company as the only one in London, Philippou testified that he rented a van and took all of the equipment and records from Granite Capital's office and brought it to his apartment. (Tr. at 81). He explained that he intended to return these things and he ultimately did give them to Apostolides,

8

who had come to London in July 2006. (Tr. at 82, 189-90).

Philippou claims that he is due salary for the seventeen-month period of February 2005 through June 2006 at $5,000/month for a total of $85,000 less $48,500 that he received, leaving a balance due of $36,500. (Ex. 2; Tr. at 214). Defendant contends that this amount should be further reduced by $2,500 because, as plaintiff acknowledged, he billed for the entire month of February when, in fact, he only worked for two weeks that month.

## CONCLUSIONS OF LAW

A. Preliminary Matters

1. Jurisdiction and Choice of Law

Subject matter jurisdiction for the plaintiff's case is founded on diversity pursuant to 28 U.S.C. § 1332. The parties are citizens of different states (plaintiff is a citizen of Cyprus and defendant Cougentakis is a citizen of New York) and the complaint alleges an amount in controversy in excess of $75,000. Although plaintiff has since withdrawn his claims for an equity interest in Granite Capital Limited leaving damages for unpaid salary of just $36,500, the Court is not divested of subject matter jurisdiction. See Hall v. Earthlink Network, Inc., 396 F.3d 500, 506-07 (2d Cir. 2005) ("[F]or purposes of diversity jurisdiction, the amount in controversy is established as of the date of the complaint and is not reevaluated based on post-filing events) (citing St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289-90, 58 S.Ct. 586, 82 L.Ed 845 (1938) ("Events occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction."); Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc., 166 F.3d 59, 62-63 (2d Cir. 1999). In addition, the parties agree that their dispute is governed by the substantive law of the state of New York. Texaco A/S (Denmark) v. Commercial Ins. Co. of Newark, N.J., 160 F.3d 124, 128 (2d Cir. 1998) ("'[W]here the parties have agreed to the

application of the forum law, their consent concludes the choice of law inquiry.'") (quoting American Fuel Corp. v. Utah Energy Development Co., Inc., 122 F.3d 130, 134 (2d Cir. 1997)).

B. Substantive Claims

I. Breach of Contract

It is well-established under New York law that "[t]o establish a prima facie case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) breach of that contract; and (3) damages resulting from the breach." National Market Share, Inc. v Sterling Nat. Bank, 392 F.3d 520, 525 (2d Cir. 2004) (citing RIJ Pharm. Corp. v. Ivax Pharms., Inc., 322 F. Supp. 2d 406, 412 (S.D.N.Y. 2004)). Here, Philippou contends that he had an oral contract with Cougentakis for Philippou to establish and manage Granite Capital in London. In exchange for such services, Philippou contends that Cougentakis agreed to pay him $5,000 per month, along with a percentage of equity in the business.[4] Philippou claims that Cougentakis breached that agreement by failing to pay his monthly salary and seeks damages in the sum of $36,500. Defendant Cougentakis concedes that there was an oral contract for Philippou to provide his services. However, defendants contend that such agreement was solely between Philippou and the corporate entity, Granite Capital. Accordingly, Cougentakis argues that he is not personally liable for a breach of that agreement. In addition, Cougentakis contends that the salary portion of the agreement was limited to a six-month period, namely the time that the defendants had estimated would be required to obtain FSA approval for Granite Capital and for the London office to begin doing business. Given that it took approximately seventeen-months for the London office to

---

[4]As noted earlier, at the conclusion of the trial, plaintiff withdrew his claim for an equity share of the business based upon the fact that the business does not exist or has no equity. Accordingly, the Court limits its discussion and analysis of the breach of contract claim to unpaid salary.

10

become operational, defendants contend that Philippou is not entitled to the claimed balance due. For the reasons that follow, the Court disagrees.

The Court will first analyze the existence and enforceability of the alleged contract and then will address the question of personal liability. With regard to the existence of a contract, the evidence presented at trial was largely undisputed. There was an agreement, authorized by Cougentakis allegedly on behalf of the soon to be created entity, Granite Capital, and communicated to Philippou by Lellos for Philippou to set up and start the operation of a London office. There was an agreement to pay Philippou $5,000/month for his services. Accordingly, Philippou sent monthly invoices to Cougentakis in care of Granite Associates for that sum.

At trial, defendants contended that the salary portion of the agreement was limited to a six-month period, namely the time that the defendants had estimated would be required to obtain FSA approval for Granite Capital and for the London office to begin doing business. Given that it took approximately seventeen-months for the London office to become operational, defendants contend that Philippou is not entitled to the claimed balance due. Defendants' contention is implausible. Defendants' position is belied by the fact that Philippou was actually compensated for nearly ten months, not six. Philippou received $30,000 directly from Granite Associates for partial payment of the invoices that he submitted and an additional $18,500 from the Granite Capital account. Philippou, as the authorized signatory on the Granite Capital checking account, wrote a check to himself for $18,500 on May 5, 2006 for salary earned. This payment, made well over a year from the time Philippou began working on this venture was never challenged or disputed by the defendants, including Cougentakis. Moreover, after the six months were up, it is undisputed that no one ever communicated to Phillipou that he should stop working, or that he would no longer be paid. Further belying the defendants' argument, Granite Associates continued to fund Granite

Capital well beyond any six-month limitation. Indeed, as reflected by the Granite Capital's banking records that were introduced at trial, Granite Associates continued to transfer funds to Granite Capital as late as January 2006, notwithstanding the defendants' claim that there was a six-month time frame for the company to be operational or else they would give up altogether on the project. (Exs. 167 and 168). Equally compelling is the fact that Granite Capital continued to pay the VAT as late as February and May 2006. (Ex. 167). Given this evidence, the Court finds that there was no condition that Granite Capital was to be operating and doing business within six months and thus the agreement to compensate Philippou at the monthly rate of $5,000 was not limited to six months. Accordingly, the Court finds that there was an oral contract to pay Philippou at the rate of $5,000/month for his services in preparing Granite Capital for operation, including its registration and FSA approval, and that such agreement was not limited to six months.

Given that the contract at issue is oral, the Court must consider whether the statute of frauds bars enforcement. New York's statute of frauds provides, in relevant part:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum hereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> 1) By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime; . . .

N.Y. Gen. Oblig. Law § 5-701(a)(1). With regard to this one-year provision, the Second Circuit has instructed that "'only those contracts which, by their terms, 'have absolutely no possibility in fact and law of full performance within one year'" fall within this provision and are required to be in writing and signed by the party to be charged therewith. Guilbert v. Gardner, 480 F.3d 140, 151 (2d Cir. 2007) (citing Cron v. Hargro Fabrics, Inc., 91 N.Y.2d 362, 670 N.Y.S.2d 973, 694 N.E.2d 56, 58 (1998) (quoting D & N Boening v. Kirsch Beverages, Inc., 63 N.Y.2d 449, 483 N.Y.S.2d 164,

472 N.E.2d 992, 993 (1984)). Thus, the issue before the Court is whether there was any possibility that the contract in question could have been fully performed within one year. It is well-established under New York law that employment for an indefinite or unspecified term is presumed to be at will and freely terminable by either party at any time without cause or notice. See, e.g., Reddington v. Staten Island University Hosp., 511 F.3d 126, 137 (2d Cir. 2007); Guilbert, 480 F.3d at 151 (citations omitted). Given that either party can terminate the employment relationship at any time, courts in this Circuit have routinely held that an at-will employment relationship may be completed within one year and is thus outside of the statute of frauds. Id. (citing Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441, 444 (1982) (holding that an employment agreement "whether terminable at will or only for just cause, is not one which 'by its terms', could not be performed within one year and, therefore, is not one which is barred."); Rodriguez v. Lopez, 18 Misc.3d 1127(A), 856 N.Y.S.2d 502 (N.Y. City Civ.Ct. Jan. 30, 2008) ("A contract that is terminable at will by either party does not violate the Statute of Frauds") (citing Raes v. So-Lite Furniture Corp., 4 A.D.2d 851, 166 N.Y.S.2d 471 (4th Dep't 1957)).

Here, Philippou's employment was presumptively at will. The testimony and evidence presented during trial plainly established that Philippou's employment was for an indefinite or unspecified term. Even if this Court were to find, as the defendants argued, that his employment was goal-specific and would end after six months if Granite Capital were not up and running, such agreement is outside the statute of frauds. Certainly, the six-month time frame is well-within the one-year requirement. Accordingly, enforcement of the oral employment contract is not barred by the Statute of Frauds. Ohanian v. Avis Rent-A-Car System, Inc., 779 F.2d 101, 106 (2d Cir. 1985) ("[F]ar from serving as a barrier to fraud- in the case of a genuinely aggrieved plaintiff barred from enforcing an oral contract- the statute may actually shield fraud.").

Having found an enforceable contract, the Court addresses the breach element. The evidence presented at trial plainly established that Philippou worked from mid-February 2005 through June 2006 without compensation for approximately seven months. (Tr. 110). Philippou claims that he is due salary for the seventeen-month period of February 2005 through June 2006 at $5,000/month for a total of $85,000 less $48,500 that he received, leaving a balance due of $36,500. (Ex. 2; Tr. at 214). Defendants acknowledge that Philippou was not paid for those months.[5] However, the defendants contend that the amount plaintiff claims should be further reduced by $2,500 because, as plaintiff acknowledged, he billed for the entire month of February when, in fact, he only worked for two weeks that month. The Court agrees and thus Philippou is entitled to $34,000 in unpaid compensation. Having found that Philippou has prevailed on his breach of contract claim and is entitled to recover the full amount of his earned compensation, the Court need not address his alternate theories for the same relief, namely breach of implied in fact contract, promissory estoppel, unjust enrichment, constructive trust, account stated or accounting.

II. Individual Liability of Cougentakis

A. Promoter Who Agrees to a Pre-Incorporation Contract

Having found an enforceable employment contract and that the plaintiff is owed $34,000, the Court must determine whether Cougentakis is personally liable for such sum. Under New York law, "a promoter who executes a pre-incorportion contract in the name of a proposed corporation is himself personally liable on the contract unless the parties have otherwise agreed." Clinton Investors Company, II v. Watkins, 146 A.D.2d 861, 536 N.Y.S.2d 270 (3d Dep't 1989); see also Oost-Lievense v. North American Consortium, P.C., 969 F. Supp. 874, 880 (S.D.N.Y. 1997)

---

[5]Having found that the consulting agreement between the parties was not limited to six-months, together with the fact that there is no dispute that Philippou was not paid for some seven months, the breach element is satisfied.

14

(recognizing personal liability of pre-incorporation promoter). It is undisputed that the corporate entity, Granite Capital, did not exist at the time that Philippou began work in February 2005. Thus, a pre-incorporation promoter such as Cougentakis is personally liable for contracts executed prior to the incorporation of an entity, even if the corporation would otherwise be considered the contracting party. Brandes Meat Corp. v. Cromer, 146 A.D.2d 666, 537 N.Y.S.2d 177 (2d Dep't 1989) (defendant held personally liable for obligations he incurred purportedly on behalf of an entity which, at such time, did not exist) (citing Lorisa Capital Corp. v. Gallo, 119 A.D.2d 99, 506 N.Y.S.2d 62 (2d Dep't 1986) (add'l citations omitted); see also Imero Fiorentino Assocs., Inc. v. Green, 85 A.D.2d 419, 420-21, 447 N.Y.S.2d 942 (1st Dep't 1982) (individual defendant liable for agreement made on behalf of a nonexistent principal). Indeed, a corporation which did not "exist[] at the time the contract was entered into, cannot be bound by the terms thereof 'unless the obligation is assumed in some manner by the corporation after it comes into existence by adopting, ratifying, or accepting it.'" Metro Kitchenworks Sales, LLC v. Continental Cabinets, LLC, 31 A.D.3d 722, 723, 820 N.Y.S.2d 79, 81 (2d Dep't 2006); see also Wieder v. Stimler, 18 Misc.3d 137(A), 859 N.Y.S.2d 900 (N.Y. App. Term 2008) ("[W]hen a promoter executes a contract on behalf of a nonexistent corporation, the promoter is presumed to be personally liable under that contract absent proof of the parties' contrary intent or until 'there has been a novation between the corporation' and the other contracting party.") (citation omitted). Here, Cougentakis has proffered no evidence that Granite Capital adopted, ratified or accepted the salary agreement he made with Philippou. Thus, there is no basis for the court to overcome this presumption and shift his liability for Philippou's salary to Granite Capital.

B. Promise to Pay the Debt of Another

Cougentakis is personally responsible for Philippou's salary for the additional reason that

15

he, Cougentakis, made a "special promise to answer for the debt, default or miscarriage of another." N.Y. Gen Oblig. Law § 5-701(a)(2). Section 5-701(a)(2) of New York's General Obligations Law ordinarily requires that such a promise be written to be enforceable. However, where the promisor receives a "benefit or consideration from his promise . . . 'a writing is not required because the promisor has received something and the circumstances show probable liability.'" Jenkins v. Engram, 194 Misc.2d 187, 190, 753 N.Y.S.2d 315 (City of Rochester 2002) (quoting Martin Roofing v. Goldstein, 60 N.Y.2d 262, 265 (1983)); see also Kutner v. Vazquez, 17 Misc.3d 1123(A), 851 N.Y.S.2d 70 (Nassau Cty. 2007). Here, it is undisputed that Philippou continued to work after the March 2006 discussion with Cougentakis. Although Cougentakis denied the substance of that conversation at trial, the court credits Philippou's testimony in this regard. Philippou's testimony made clear that his continued performance was in reliance on the assurances made by Cougentakis that he would pay Philippou. (Tr. at 149). Thus, the court finds that Philippou's performance after March 2006 is sufficient consideration for Cougentakis's promise. Carey & Assocs. v. Ernst, 27 A.D.3d 261, 264, 810 N.Y.S.2d 475 (1st Dep't 2006) ("An oral agreement may be enforceable despite the lack of writing where a plaintiff's part performance is 'unequivocally referable' to that oral agreement."). However, the court's analysis does not end here because the law also requires that the "consideration must be beneficial to the promisor." Martin Roofing, Inc., 60 N.Y.2d at 266. Although Cougentakis was a shareholder of Granite Capital, the mere fact of stockholdings in the entity is insufficient to infer a benefit to Cougentakis. Id. However, the undisputed evidence at trial established that, following Cougentakis's March 2006 promise, Philippou was instructed to issue all of the shares of Granite Capital to Cougentakis. (Tr. at 67, 107, Ex. 112). Philippou's compliance with that directive was a direct benefit to Cougentakis and would not have been done absent Cougentakis's promise that he would pay Philippou. Given

Philippou's testimony that he first learned that he was not going to be a shareholder in Granite Capital when he was instructed to issue all of the shares to Cougentakis, his continued performance is referable only to Cougentakis's promise. There is no support in the record that Philippou volunteered his services and it defies logic that he would continue to work with no prospect of compensation, either by salary or shareholding. Thus, the exception to the Statute of Frauds is satisfied and Cougentakis is liable for his "special promise."

In the context of piercing the corporate veil, the Second Circuit has instructed that "courts apply the preexisting and overarching principle 'that liability is imposed to reach an equitable result.'" Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 18 (2d Cir. 1996) (quoting Brunswick Corp. v. Waxman, 599 F.2d 34, 36 (2d Cir. 1979)). So too, given that Granite Capital is defunct, an equitable result may only be achieved here by holding Cougentakis liable for the unpaid salary.

## CONCLUSION

For the reasons set forth above, the plaintiff is entitled to recover from Cougentakis the amount of $34,000. The Clerk is directed to enter judgment accordingly and thereafter to close this case.

**SO ORDERED.**

Dated:       Central Islip, New York
              April 21, 2009

                                         MICHAEL L. ORENSTEIN
                                         United States Magistrate Judge